### CITIZENS' NAT. BANK OF JASPER v. RATCLIFF & LANIER.
(No. 410–3769.)

(Commission of Appeals of Texas, Section B. June 30, 1923.)

**1. Banks and banking ⬅227(1)—Burden of proof on party alleging negligence of bank as bailee.**

The party alleging negligence of a bank as bailee of liberty bonds must prove it.

**2. Banks and banking ⬅105(3)—Cashier accepting liberty bonds for transmission and sale acted for bank.**

Where a cashier accepted and agreed to sell liberty bonds and credit the proceeds to depositor, and, through failure of the bank stenographer to properly register a letter to a correspondent bank containing the bonds, they were lost, the cashier acted in his official capacity only.

**3. Bailment ⬅12—Gratuitous bailee liable for gross negligence.**

A gratuitous bailee is liable for gross but not ordinary negligence.

**4. Bailment ⬅14(1)—Mutual benefit bailee held liable for ordinary negligence.**

In a bailment for mutual benefit of both parties, whatever the nature of the benefit to the bailee, the bailment is not gratuitous, and the bailee is liable for ordinary negligence.

**5. Banks and banking ⬅194—Evidence held to show ordinary negligence.**

Where a cashier accepted two liberty bonds agreeing to sell them and credit the proceeds to depositor's account, and the bank stenographer finding the post office registry closed placed the letter to a correspondent bank, con-taining the bonds, stamped and marked "For Registration," in a post office box in accordance with a custom of the bank, to subsequently issue receipts therefor, and the bonds were lost, the bank was guilty of ordinary negligence.

**6. Banks and banking ⬅194—Deposit for indefinite time is consideration for bailment of liberty bonds.**

Where bank accepts liberty bonds for sale and credit of the proceeds to the owner's account, the deposit of the money, representing such proceeds, for an indefinite time constitutes actual value to bank on its contract of bailment.

**7. Bailment ⬅2—Direct charge not necessary to constitute bailment for hire.**

A direct charge for services is not necessary to constitute a bailment for hire, if the bailment is incidental and beneficial to the bailee's business.

**8. Bailment ⬅2—Test of lucrative bailment is acceptance for purpose of benefit or profit.**

In determining whether a bailment is gratuitous or lucrative the inquiry is not directed to the character or certainty of the benefit or profit, but whether it was accepted for the purpose of deriving one or the other.

**9. Banks and banking ⬅194—Bank accepting liberty bonds for sale held a bailee for hire.**

Acceptance by a bank of liberty bonds for sale and credit of proceeds to the owner's account constitutes the bank a bailee for hire, the bailment being incidental to the business.

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Action by B. S. Ratcliff and T. B. Lanier, doing business as Ratcliff & Lanier, against the Citizens' National Bank of Jasper and another. Judgment for plaintiffs against the bank was affirmed by the Court of Civil Appeals (238 S. W. 362), and defendant named brings error. Affirmed.

Smith & Lanier, of Jasper, for plaintiff in error.

Wightman & Force, of Newton, and G. E. Richardson, of Jasper, for defendants in error.

POWELL, J. B. S. Ratcliff and T. B. Lanier were the constituent members of the mercantile firm of Ratcliff & Lanier, of Jasper, Tex. This firm owned two liberty bonds issued by the United States government, each being of the face value of $500 and of the class known as the Fourth Liberty Loan. The bonds were made payable to bearer. At the same time this mercantile firm was doing business in Jasper, there was a bank operating there known as the Citizens' National Bank, incorporated by the United States government, and of which one John H. Seale, Sr., was cashier. The facts leading up to the filing of the instant suit are undisputed and have been fully set out in

the opinion of the Court of Civil Appeals. In that opinion, the bank is referred to as "appellant," and the members of the mercantile firm as "appellees." These were the facts:

"On February 27, 1920, appellees were the owners of the above-mentioned bonds, and for some time prior to that date kept them in a safety deposit box in appellant bank, to which appellees had free access, and over which they exercised complete control. On the day mentioned, Mr. Lanier of the firm went to the bank and took the bonds from the safety deposit box and turned them over to Mr. John H. Seale, in his capacity as cashier of the bank, with the request that the bank sell the bonds for appellees upon the best terms obtainable, and deposit the proceeds in the bank to the credit of the appellees. At that time appellees were regular customers of the bank and regularly carried a deposit in the bank, and the bank was engaged in the regular banking business under the banking laws of the United States. The bank was not in the market for purchasing such bonds, but Mr. Seale testified that the bank for some time had been handling such bonds for its customers in general, when requested to do so, and making sales of them where it could, and would deposit the proceeds in the bank to the credit of its customers. As to this particular transaction, Mr. Seale testified, substantially, that he told Mr. Lanier that the bank would send these two bonds to its correspondent bank at Houston, the First National Bank of Houston, with instructions to sell the same upon the best terms obtainable, and that, when such sale should be made and the proceeds received, the same would be deposited in the bank and the appellees credited therewith. Mr. Lanier testified that he did not remember whether Mr. Seale made any statement to him as to where or to whom the bonds would be shipped for sale, but that he did understand that they were to be sold by the bank as stated, and the proceeds deposited to the credit of his firm in the bank. At the time of this transaction between Mr. Seale and Mr. Lanier, there was employed as bookkeeper and stenographer in the bank a young lady, Miss Henderson, about twenty years of age, and on the same day of the transaction between the parties, Mr. Seale, acting for the bank, dictated a letter to the First National Bank of Houston, in which he stated that he was inclosing the two bonds mentioned, and requested the Houston bank to make a sale of the bonds for their best market value, and to credit the account of the Citizens' National Bank of Jasper with such proceeds on the books of the Houston bank. Mr. Seale testified, and there is no dispute on the point, that he was careful to instruct Miss Henderson to register the letter in the post office at Jasper before placing it in the mail. The young lady, Miss Henderson, testified by deposition, and stated, substantially, that she wrote the letter as dictated by Mr. Seale and placed it, together with the bonds, in an envelope, and took it to the post office at Jasper on the same day, with the intention of having the same put in the registered mail and taking a receipt therefor; that the envelope was sufficiently stamped for registration and marked as a registered package before it left the bank's office, but that when she got to the post office she found the registry window closed, and in keeping with the custom of the bank, under such circumstances, she placed the envelope in the post office box without taking any registry receipt therefor. She testified that on numerous occasions prior to this she had so deposited packages intended to be registered in the post office, and that usually the postmaster at Jasper would issue a registry receipt to the bank and place it in the bank's mail box, and that with the next incoming mail to the bank the bank would receive such registry receipt. On this occasion, however, the testimony is undisputed to the effect that the post office at Jasper did not issue any registry receipt for this mail package, and, when this was discovered a day or two later, appellant instituted an inquiry about the matter, and learned from the post office employés that such registry receipt had not been issued, and on not hearing from the Houston bank within the expected time relative to these bonds, appellant instituted an active inquiry, with a view to locating them. The Houston bank denied receiving the bonds at all, or any letter concerning them, and after long and persistent inquiry and efforts to find these bonds or some trace of them appellant was unable to do so, and the bonds were never returned to appellees, and the appellant refused to credit appellees with the value thereof, as was agreed. This refusal on the part of appellant to return the bonds or account to appellees for their value resulted in this suit."

The suit was instituted in the district court of Jasper county, Tex., by the mercantile firm, against the bank and its cashier. It was a suit to recover the value of aforesaid bonds. As said by the Court of Civil Appeals:

"There are two counts in the plaintiffs' petition, the first claiming liability against defendants as for conversion of said bonds, and second, alleging that, in the event it should be determined upon trial that the bonds were not converted, then both the bank and Seale were liable as bailees to the plaintiffs for the value of said bonds, in consequence of negligence on their part which resulted in the loss of the bonds."

The defendants filed a joint answer as shown by the Court of Civil Appeals. The only defense before the court here is that the bank was a purely gratuitous bailee only and not liable for damages resulting from ordinary negligence; that it could be held liable for gross negligence only. In reply to this defense, the firm contends that the bank was a bailee for hire; that the bailment was for the mutual benefit of the bank and the firm; that, occupying such a status, the bank was liable because, under the jury's verdict, it was guilty of ordinary negligence in handling these bonds.

[1] The case was tried before a jury upon one special issue. The court correctly defined negligence and properly cast the burden of proof upon the firm to establish its

allegation as to the bank's negligence. Thereupon the court submitted to the jury the following issue:

"Was the defendant, the Citizens' National Bank, its cashier, or employés, negligent in preparing for transmission and transmitting to the First National Bank of Houston the bonds described in plaintiffs' petition? You will answer this question 'Yes' or 'No,' as you find the fact to be."

The jury answered above issue in the affirmative.

Aside from peremptory instructions in behalf of the various parties, the submission of only one other issue was requested, and that was one suggested by counsel for the bank, defining negligence, slight negligence, ordinary negligence, and gross negligence, and asking the jury, in the light of such charge, to say of which character of negligence, if any, the bank was guilty. The court refused this charge.

[2] Upon the return of the verdict of the jury, the court rendered judgment in favor of the partnership firm against the bank for the value of the bonds, with interest and costs of court. There is no contest about the amount of the judgment. The court accepted the statement of the bank's cashier as to the market value of the bonds when lost. As to the defendant Seale, individually, the judgment was in his favor. As said by the Court of Civil Appeals, "the undisputed proof shows that he acted in the transaction solely as the cashier and agent of the bank and not in his individual capacity."

The bank appealed from the judgment against it to the Court of Civil Appeals at Beaumont. That court, in an opinion by Chief Justice Hightower, affirmed the judgment of the district court. See 238 S. W. 362. Thereupon, the bank made application to the Supreme Court for writ of error, which was duly granted "because of the importance of the question."

[3, 4] We have already indicated the nature of the controlling question on this appeal. In handling the sale of these bonds, was the bank a gratuitous bailee purely, or one for hire? The law applicable, under each status, has been correctly stated, in our judgment, by the Court of Civil Appeals, as follows:

"If counsel for appellant were correct in their contention that appellant, under the facts of this case, was a gratuitous bailee in handling these bonds, they would also be correct in their contention, according to the weight of authority as we find it, that no liability could be established against appellant in the absence of proof of gross negligence or bad faith. This seems to be the general rule. 3 Am. & Eng. Enc. of Law (2d Ed.) 745. This rule seems to have been adopted by the Supreme Court of this state at an early date, as shown by the decision in Fulton v. Alexander, 21 Tex. 148. See, also, Texas Central Railway Co. v. Flanary

(Tex. Civ. App.) 50 S. W. 726. But it is also well established as a general rule that where the bailment is for mutual benefit of the parties to the transaction, whatever may be the nature of the benefit to the bailee, the bailment is not gratuitous, and in such case the bailee is held to the exercise of ordinary care. In other words, where the bailment is for mutual benefit of the parties, the bailee must be responsible for breach if only ordinary negligence be shown. 5 Cyc. 184. The author cites in support of this rule authorities from practically every state in the union."

As we read the briefs, there is really no controversy among counsel over the principles of law here applicable. It is merely a conflict of opinion as to whether or not the bailment was for mutual benefit of the parties. But, if there is any controversy over the law as announced near the end of our last quotation, then we refer to the following authorities:

The quotation from Cyc., above referred to, reads as follows:

"Where a bailment is for mutual benefit, the bailee is held to the exercise of ordinary care in relation to the subject-matter thereof, and is responsible only for ordinary negligence."

In Corpus Juris, vol. 6, p. 1121, we read:

"Where a bailment is for mutual benefit, the bailee, in the absence of special contract, is held to the exercise of ordinary care in relation to the subject-matter thereof and is responsible only for ordinary negligence."

The author of above quotation cited a hundred or more cases from various states of the union, including Texas, in support of the text. The same rule is announced in that splendid work on Bailments by Judge Story, as we shall show in a quotation hereafter.

It is quite evident that the author of Ruling Case Law has read most of the applicable decisions upon the question now under discussion. We say this, because he has written a very accurate paragraph on "when a bailment is gratuitous or for mutual benefit." We quote as follows from Ruling Case Law, vol. 3, p. 94:

"With the growth and expansion of commerce, of trade, and of industrial pursuits, multiplying every species of contract, and drawing all classes into more frequent and varied intercourse, bailments multiply; and it is sometimes a matter not free from difficulty to determine to what class, whether gratuitous or lucrative, a particular transaction may belong. The general rule of course is clear that a person becomes a bailee for hire when he takes property into his care and custody for a compensation. Just when a compensation is present, however, is not always so easy of ascertainment, and it seems that it is not too much to say that each transaction depends largely upon its own facts and circumstances, and the existing relations, if any, the parties may have to each other. In determining wheth-

er a bailment is gratuitous or lucrative—a bailment without compensation or benefit to the bailee, or from which he is to derive benefit or profit—the inquiry is not directed to the character or certainty of the benefit or profit but to whether the bailment was accepted for the purpose of deriving the one or the other. Thus where an association invites persons to supply articles to enable it to conduct an exhibition it may be said that the essential elements and characteristics of a lucrative as distinguished from a mere gratuitous bailment exist in favor of the person who responds to the invitation by placing articles in its care for exhibition. And as a general proposition it may be stated that if the bailment was made at the instance or on the invitation of the bailee because of benefits, direct or contingent, expected to accrue, or on a contract, express or implied, having a legal consideration, it is not gratuitous. However, the acceptance by a hotel porter of baggage from one who intends to become a guest at the hotel but does not do so, establishes merely a gratuitous bailment. The nature and amount of the compensation are immaterial, as the law will not inquire into its sufficiency, or the certainty of its being realized by the bailee. That is left to the parties, who are the sole judges of the benefits or advantages to be derived from their contracts. It is sufficient if the consideration be of some value, though slight, or of a nature which may inure to the benefit of the party making the promise. Thus where a customer in a store lays aside garments while trying on new ones, or where the proprietor of a bathing establishment, who receives from his patrons a sum demanded for the privilege of the bath, assumes the custody of their wearing apparel while they are bathing, a bailment for hire arises, for while the customer or patron pays nothing directly, or eo nomine, for the safekeeping of his effects, the dealer or bathhouse keeper receives his recompense in the profits of the trade of which the bailment is a necessary incident. So a bank which receives from a customer bonds as collateral security for a debt then existing, and for future obligations, is not a gratuitous bailee, but the transaction constitutes a bailment for mutual benefit. The finder of property ordinarily is, of course, a gratuitous bailee, but it seems that, if it is provided by statute that the finder shall be entitled to a compensation for the keeping, or if an agreement to that effect may under the circumstances reasonably be inferred, the presumed contract of the finder and his liabilities will be those of a depositary for hire. Where trunks are voluntarily received from an intending passenger, by a carrier, and no objection is made to their retention until his departure on the train, even though the interval between such receipt and the departure of the train is unreasonable, so that the liability as carrier does not exist, the relation between the parties is that of a bailment for mutual benefit. Where, however, a passenger on a railroad train, after arriving at the end of his route, takes his baggage into his own exclusive possession and control, but afterwards, for his own convenience, redelivers it to the baggage master at the depot to be kept until sent for, it is a gratuitous bailment."

[5] There is no question but that the bank was guilty of ordinary negligence in sending these bonds, as it did, to its Houston correspondent. The cashier said so, stating that it was not safe and was an unbusinesslike method. The verdict of the jury, therefore, could hardly have been otherwise than it was. Bonds payable to bearer would naturally tempt any thief. An envelope, containing them, marked for registration by the sender, would naturally arouse suspicion of a would-be thief. In other words, a near thief seeing an envelope from a bank, intended to be registered, would naturally think it contained something valuable. Without registration, a thief would know it would be difficult, if not impossible, for the postal authorities to trace him. Counsel for the bank admit it was guilty of ordinary negligence in this case.

Therefore, if the bailment was mutually beneficial to the bank and the firm, the judgment of the lower courts must be affirmed.

The Court of Civil Appeals shows that it was to the benefit of the bank, in several ways, to handle these bonds. In the first place, the firm was a regular customer and depositor of the bank. Perhaps the chief purpose of a bank engaged in the regular banking business, as this bank was, is to secure and retain depositors. The firm had no convenient way to sell its bonds. The bank, as an incident to its business, was prepared to make the sale without any trouble. By looking after this matter for its customer, the bank cashier might well have calculated that such an act would be conducive to the retention of this firm's regular account. There is keen competition in the banking business, and like every other business, such a business grows in proportion to its willingness to accommodate those doing business with it.

[6] But, aside from a retention of the firm's old account, the bank, under the very contract in suit, was to deposit the proceeds of the sale of these very bonds in its own vaults to the credit of the firm and subject to its check. It is true the firm might have checked out these funds in a few days, in whole or in part. But a deposit of something like $1,000, even for a short time, is of actual value to a bank. The proof shows that this bank paid depositors no interest in any case. A bank is making loans all the while and usually keeps its money, in excess of its reserve, loaned out, either to individuals or to its correspondent city banks. In fact, a bank, in a large measure, makes its profit by reason of collecting interest on loans made from its deposits. It is for that reason that banks make every effort, by extending courtesies and otherwise, to increase their deposits. It is clear to us that this deposit for an indefinite time was of actual value to the bank, and therefore beneficial to it within the meaning of the authorities cited.

We do not think it necessary to discuss other possible benefits to the bank under this

bailment, such as getting credit a short while for the deposit of this money with its Houston correspondent.

[7] It is true, the cashier charged no stated fee for this service. He received no definite compensation. But the authorities are not so restricted. The benefits we have discussed are just as effectual in constituting one a bailee for hire as would be a direct charge for services and an agreement to pay it. In the case of Compress Company v. Nunnally, 67 Ark. 284, 54 S. W. 872, the plaintiff had sent 60 bales of cotton to the compress for safekeeping, etc. The company did not shelter it, and it was damaged, by rain and otherwise, during a period of six months. The company claimed it was not running a storage business and that its delay in compressing the cotton was due to the fact that it had not been ordered to do so; that it had not made any charge for storage and was, therefore, not liable for failure to protect the cotton from the weather. The suit for damages was for $1,000. The recovery in the lower court was for about half that amount. The judgment was affirmed by the Supreme Court of Arkansas, in the following language:

"There was evidence from which the jury might have concluded that the compress company received the cotton, and expected to charge storage for same. There was also proof to justify the conclusion that the compress company received the cotton with the expectation of getting its compensation for keeping same in the way of charges for compression. In either event, the appellant would be a bailee for hire. We will not discuss the evidence in detail, but a finding that the compress company was not a gratuitous bailee is certainly abundantly supported by the evidence. The bailment was reciprocally beneficial to the bailee and bailor, and the bailee was answerable for a want of ordinary care, or for ordinary neglect. Railway Co. v. Henson, 61 Ark. 302, 32 S. W. 1079, 3 Am. & Eng. Enc. Law, p. 746."

In above case, there was no charge made by the compress company for safely keeping and storing this cotton. And yet the court held it was a bailee for hire if it merely expected to get its compensation for keeping the cotton in the way of compression fees. In the case at bar, while the bank made no direct charge for selling the bonds through its Houston correspondent, the trial court was amply justified in rendering judgment against it upon the theory that it was expecting to receive actual benefits from the agreed deposit of the proceeds of the sale.

[8] In order to constitute one a bailee for hire, it is not necessary that the benefits should be large, certain, or of any particular nature. As already quoted from Ruling Case Law, "the nature and amount of the compensation are immaterial, as the law will not inquire into its sufficiency, or the certainty of its being realized by the bailee." Again,

from the same author, "it is sufficient if the consideration be of some value, though slight, or of a nature which may inure to the benefit of the party making the promise."

As heretofore quoted from Ruling Case Law, in determining whether a bailment is gratuitous or lucrative, "the inquiry is not directed to the character or certainty of the benefit or profit, but whether the bailment was accepted for the purpose of deriving one or the other."

[9] Under the rules laid down in the last three quotations from Ruling Case Law, we believe there is no doubt but that the bank, in the instant case was a bailee for hire. Its sale of the bonds was incident to its own business. It had been doing this for its various customers for some time. It was to obtain a direct benefit in the deposit of the proceeds of the sale, and it doubtless thought that its business, generally speaking, would profit in other ways by pleasing and retaining its customers through these courtesies. In other words, it undertook the sale of these bonds with a view of deriving "benefit and profit" from such act.

The authorities have gone a long way in many states in holding a bailee to be one for hire and liable for ordinary negligence. For instance, in Corpus Juris, vol. 6, p. 1125, we read:

"A shopkeeper, a restaurant keeper, a barber, a bathhouse proprietor, or other similar person in whose custody clothing or other articles are deposited temporarily as an incident to his general business is liable as an ordinary bailee for hire for any loss resulting from ordinary negligence."

One very interesting case cited by Corpus Juris in support of above text is that of Woodruff v. Painter, 150 Pa. 91, 24 Atl. 621, 16 L. R. A. 451, 30 Am. St. Rep. 786, by the Supreme Court of Pennsylvania. In that case the defendants were retail dealers in clothing in Philadelphia. The plaintiff went there to buy a suit of clothes. His wife accompanied him. When he was ready to try his suit on, he took off his old suit and laid it aside on a counter. The clerk told him to put his watch and chain inside a nearby drawer, telling him he guessed it would be safe there. When the plaintiff was through shopping, his watch and chain were gone. He sued for its value. The trial court nonsuited the plaintiff, but the judgment was reversed by the Supreme Court. That court spoke as follows:

"Assuming that the jury would have found that a watch is such personal belonging as men usually carry with them, and that in the selection of a suit of clothes it is necessary or usual to remove it from the person, and lay it aside; and, further, that the plaintiff, by direction of the defendants' salesman, placed his watch in a designated drawer in the store, preparatory to the selection of a suit of clothes, to

purchase which he visited the store, the defendants thereby became chargeable as bailees. The principles which govern that relation are briefly and clearly stated by Judge Story, in his work on Bailments, thus: 'When the bailment is for the benefit of the bailor, the law requires only slight diligence on the part of the bailee, and of course makes him answerable only for gross neglect. When the bailment is for the sole benefit of the bailee, the law requires great diligence on the part of the bailee, and makes him responsible for slight neglect. When the bailment is reciprocally beneficial to both parties, the law requires ordinary diligence on the part of the bailee, and makes him responsible for ordinary neglect.' Manifestly the bailment, in a case like the present, is of the latter class, for, while the customer pays nothing directly, or eo nomine, for the safe-keeping of his effects, the dealer receives his recompense in the profits of the trade of which the bailment is a necessary incident. It was upon this principle that Lord Holt said, in Lane v. Cotton, 12 Mod. 483, an action was sustainable against an innkeeper for the loss of a guest's goods, and that the Court of Appeals affirmed the judgment of the court of common pleas of the city of New York in Bunnell v. Stern, supra. In Massachusetts the proprietor of a liquor store, who permitted an order slate for an expressman to be kept in his store, and allowed people to leave packages there to be taken away by the expressman, was held to be a bailee for hire on the theory that what he thus permitted brought him an increase of business. Newhall v. Paige, 10 Gray, 366. This, however, would seem to be pushing the principle to a dangerous extreme; it would render it unsafe for any business man to allow another's property to be left about his premises, and would be in seeming conflict with our own case of First Nat. Bank of Carlisle v. Graham, 79 Pa. 106, and De Haven v. Kensington Nat. Bank, 81 Pa. 95. The safer rule is to hold a bailment to be for hire when no hire is paid in such cases only as it is a necessary incident of a business in which the bailee makes profit; and such the jury might have found the present case to have been."

In this Pennsylvania case and the cases it cites, the bailee received no consideration directly, or eo nomine, for the safe-keeping of the articles in question. But their safe-keeping was an incident to the building up and increasing of the principal business of the bailee. The Pennsylvania court holds that a bailee. under those circumstances, can be one for hire. only where the safe-keeping of the article is a necessary incident of a business in which the bailee is engaged in making a profit. In Massachusetts, however, the Supreme Court went much further and not only held that it need not be a necessary incident of the bailee's business, but really no incident at all. In that case, the court held the bailee liable for the safe-keeping of articles which were not connected with his business, but which the court held the bailee undertook to protect in order that people, encouraged to visit his place of business for dealings with the expressman, would

probably also buy liquor from him. There are many cases similar to the Pennsylvania and Massachusetts cases.

In the case at bar, however, the increase in business generally, or the retention of this firm's regular account, is not the only benefit to the bank. As we have shown, the deposit of the proceeds of the sale of the bonds would have been of some actual value, and a direct compensation to the bank as a consideration for its undertaking. Therefore, it is not necessary for us to go as far as the Pennsylvania and Massachusetts cases go in order to hold the bank liable in the instant case.

There is ample warrant in the record for the judgment of the trial court, based upon the theory that the bank received benefits and profits, direct and otherwise, from this transaction, and was therefore liable for negligently transmitting the bonds in suit to Houston, as it did. As we see it, the question of gross negligence had no place in this case, as correctly stated by the Court of Civil Appeals.

We have had the same experience as the Court of Civil Appeals, when it says:

"A great array of authorities is cited by the energetic and able counsel for appellant, supporting their proposition that a gratuitous bailee cannot be held liable for loss or damage in the absence of a showing of gross negligence or bad faith, and we have read many of such authorities, but none of them go so far as to hold that a banking institution is a gratuitous bailee upon facts parallel to those in this record."

So far as our investigation discloses, our conclusion is not contrary to any of the authorities. As we see it, the bailment was clearly mutually beneficial to the bank and the partnership firm. Under all the authorities, therefore, it was liable to defendants in error as found by the district court and Court of Civil Appeals.

When one agrees to handle your property, it is but natural that you should expect him to exercise ordinary care in doing so. If, as a result of his negligence, you lose your property, you have suffered a real hardship. Of course, the law prescribes a consideration as an essential to the binding force of the contract. But that same law has been uniformly generous, and justly so, in requiring a rather clear showing that there was no consideration of any kind passing to one who has failed in his duty before permitting the latter to escape liability otherwise placed upon him. In the case at bar, these men lost a thousand dollars through the negligence of the bank. They had a natural right to expect the bank to exercise ordinary care and to have prevented this loss. The bank has not made it clear that it was to receive no benefits from this undertaking. On the other hand, its own cashier shows that it would

have received some benefits had the sale of the bonds gone through and the proceeds been received. In this case, there was no understanding that the bonds were to be handled at the risk of the owners. Nor was there any special contract relieving the bank from the results of its own negligence. If the bank had made any such requirement, the owners of the bonds would have had an opportunity to handle the sale themselves.

The other questions raised in the application have been correctly determined by the Court of Civil Appeals, in our opinion. We do not think it necessary to discuss them. In fact, the entire opinion of the Court of Civil Appeals is clear and able.

Therefore we recommend that the judgments of the district court and Court of Civil Appeals be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court.